and he has raised a number of issues in his opening brief, and the issue that I would like to address is the admission of modus operandi evidence during the trial. Appellant contends that the trial court improperly admitted modus operandi testimony in the government's case-in-chief in a non-complex criminal prosecution, a prosecution that did not involve a conspiracy and was not a particularly complex matter involving complex testimony with other parties allegedly involved in the conspiracy. This was a simple prosecution for intent to distribute. Specifically, Agent Fallon was allowed by the court to testify that the drug traffickers do not entrust large quantities of drugs to unknowing couriers. And this evidence went to the — really was the hard — the very essence, the very heart of the case, and it really sealed the government's — if there was any reasonable doubt of the defendant's guilt, this evidence, in my opinion, definitely sealed the trial in favor of the prosecution, completely weighted the scales of justice in the prosecution's favor, because knowledge was the critical issue, and the agent's testimony — So the courier was your client, huh? The courier was Mr. Leung, the appellant. Yeah. And Agent Fallon — Not Mr. Chang. Chang, according to my client, he had picked up the package on his — on his request, on his behalf. At his request, he had gone there to pick it up. And so, therefore, you would call him a courier or a mule. But your client asked Tang, didn't he, to import a BMW gearbox from Germany? Am I wrong? You're right. But my client testified that he had done it on behalf, at the request of a friend of her — of a friend of his. I believe it was Mr. Chang who asked him to do it. Okay. But the government agent, Agent Fallon, testified as an expert that a drug trafficker does not — does not entrust a substantial amount of drugs, like the $500,000 worth of drugs in this case, to an unknowing courier because the courier might be lax with it, might lose him. There were a number of reasons that the — that Agent Fallon testified that this — this package would not be entrusted to the — the appellant. Therefore, the appellant had to know that it was drugs that was — that were in the automotive part that he was picking up at the automotive shop. This essentially — this essentially, as I say, sealed the case in the government's favor because it established that the defendant, the appellant, knew what was in the package, what was in the automotive part. Well, he also talked about ecstasy and stuff like that, didn't he? Well, Your Honor, he did talk about ecstasy, but he talked about it as a — in the aspect of a consumer, more in the aspect of a consumer. He did talk about ecstasy. He said that if he had known it was coming from the Netherlands, he wouldn't have picked it up because the Netherlands are involved in a lot of ecstasy trafficking, and therefore, he wouldn't have picked it up. It's very sophisticated knowledge for somebody who's claiming to be a completely unknowing, innocent dupe in this whole process. Your Honor, I submit that this is not a sophisticated aspect of knowledge. Even I knew from reading, you know, Time magazine or reading the papers that the Netherlands is — I'm looking for the right word — is a source, is an area that is the source of a lot of ecstasy. Well — And I knew this before I got this case. Couldn't he find a BMW part somewhere else in the greater Los Angeles area? I — yes, the government was able to establish that point. In the Southern California area, there were — there were — he could have obtained his part for even less of a price than he purchased. But nevertheless, it was not — that evidence, I don't think, was enough to have tipped the scales against him, and the fact that he could have bought this cheaper in other parts of the state didn't seal the case the way that knowledge — that — the way that the expert gave testimony that the trafficker would not have entrusted to the — that the trafficker — traffickers in general do not entrust large amounts of drugs to a courier. Well, I think you've — you've more than adequately covered that — that issue. Don't you think so? Yeah. You've braved them here. So is there another issue you want to focus on? On the — on the — well, could I just state that — oh, yeah, sure — that the prejudicial effect — the trial counsel objected on the grounds that the probative value was outweighed by the prejudicial effect. Rule 403. Rule 403. And this circuit has held in Vallejo and in McGowan that expert testimony on the modus operandi of drug-trafficking is inadmissible in cases where, as here, the defendant is not charged with a conspiracy, that modus operandi evidence is only admissible in exceptional — in exceptionally complex drug cases. And this was a non-complex case. That's what I would like to say. And just to distinguish Cordoba that was cited in the government's brief, Cordoba was a complex — one of the reasons the drug — the modus operandi evidence was admissible because it was done to assist the jury understand the complex case. And those are the main points I would like to argue on that. And then the issue of — Murillo. Murillo is directly on point and seems to apply. Well, I — Murillo is not — is extremely relevant and is the closest case because it was a non-complex case. But the — it is distinguishable on the grounds that defendant here did not open the door, as was done in Murillo. In Murillo, the defendant indicated that they were going to introduce a defense of fingerprint evidence. So the rule is that the modus operandi evidence is not admissible in non-complex cases unless it's done for rebuttal purposes. And in our — in Murillo, it was done for rebuttal purposes because the government knew the defendant was going to be introducing — the issue of fingerprinting was open and the defense was going to try the case on that issue. And so, therefore, the Court in Murillo held that the door was essentially opened and the evidence was, therefore, admissible. Also, in Murillo, there was not a Rule 403 objection. In our case, there was. The prosecution says there was no such — that the objection was not proper. I submit that it was. Where do you get that out of Murillo? Because there was — I mean, the defense objected strenuously to the introduction. That's how I understood it. They didn't object at the time of the testimony, but nevertheless, they didn't object when Fallon actually gave this testimony. That's right. So we looked at that. And there — I think they're implicitly arguing in part — I don't think it's their whole argument on this sub-issue, but they're arguing in part that since it wasn't done contemporaneously, it's not allowed. But there is authority in this circuit that if the objection has been thoroughly explored at an evidence hearing before the testimony, that it's allowable. And here it was actually gone into in substantial length. But I — again, going back to Murillo, I don't think Murillo is dispositive here because I don't see why the government was allowed to introduce that evidence in its case-in-chief, the evidence on the drug operant, the motorist operandi evidence in its case-in-chief, when the defendant did not, like in Murillo, present any grounds in which it was indicating that it was going to present fingerprint evidence or any specific affirmative defense in which the — in which case it would have been allowed under Murillo to bring in this motorist operandi evidence. But the defense never provided grounds upon which the government could present this evidence in its case-in-chief. And therefore, I think Murillo is distinguishable and is not dispositive. And I would like to reserve several minutes, if the Court wants to. Kennedy, are you going to talk about the sentencing question on your main argument, or do you want to save it for rebuttal for that? Well, it's that 5C1.2 issue about did he tell them enough to be entitled to the 2.3. The fact that he didn't tell them enough about his friend, Mr. Cheng. And may I just have one moment, Your Honors? That was just one aspect of — he was candid about most of the — about everything. I mean, he — I think he gave a expanded discourse on his involvement in the offense. And he did not — and just on that one ground, I don't believe it's sufficient to have denied him his downward departure, Your Honors. Well, maybe you can cover it in rebuttal after we hear what the government has to say for that point. Yes, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. Dan Rubenstein appearing on behalf of the United States. Defendant David Leung was properly convicted before the district court by a jury. And as the Court is aware, the defendant has raised four issues challenging his conviction. Were you the prosecutor at MSK? Yes, Your Honor, I was. Were you in Chicago? Is that why you're shown as — I did, Your Honor. I now work for the U.S. Attorney's Office in Chicago. And I'm appearing before this Court as a special assistant U.S. attorney. Welcome back. Thank you. Go ahead. Just by way of factual background, the defendant was convicted after having imported a BMW gearbox from Belgium, which contained 17 pounds of ecstasy. And the record before the jury in the trial court showed that not only did the defendant arrange for this shipment and track the shipment on numerous occasions with the commercial courier and go to the location of, as the Court was asking before, Mr. Tang, the owner of Blue Star Automotive, the nominee who the defendant used to import the package arrived. He also exchanged a number of phone calls with the person he said was ultimately due the loss, Mr. Fu Chang was his name. Both the day the package was shipped, he exchanged 13 phone calls, and the day the package arrived, they exchanged 33 phone calls. In addition, as the Court is aware, the defendant made a number of incriminating statements post Miranda, also linking him to these narcotics. And finally, there was expert testimony presented, limited solely, as the case was in Murillo, about unknowing drug couriers. And as a point of fact, the Murillo case came out about two and a half weeks before this trial. It was announced by this Court on July 6th, 2001. The trial in this case began on July 24th of 2001. And if the Court looks at the careful findings that the district court made regarding the factual record, and I'm specifically referring to the 104 hearing she held regarding the expert testimony, first to establish that Mr. Leung was, in fact, a courier, and secondly, to ascertain exactly what the government intended to do with regard to the expert testimony, and then she ruled, and I'm referring to pages 49 through 52 of the government's excerpts of record. It was expressly discussed, the Murillo case, and limited that the expert testimony was going to be limited solely to the modus operandi of drug couriers. Kennedy. Murillo was a fingerprint problem, wasn't it? The defense was going to show that there were no fingerprints, and the government was going to show that there's a reason there are no fingerprints. Yes, Your Honor. And I have two responses. Obviously, this circuit between 2000 and 2002 drew some bright lines about drug traffic or, excuse me, expert testimony about drug trafficking organizations on the one hand and expert testimony about unknowing drug couriers on the other hand. Regarding expert testimony involving drug trafficking organizations, the cases are quite clear that the government cannot present that expert testimony which shows the compartmentalized nature of these international drug trafficking organizations which typically are located in Mexico, and a lot of these cases arose out of the Southern District on border stops. So the cases are quite clear that the government, in the absence of a conspiracy case or a case where the issue of fingerprints found on the narcotics is at issue, cannot present expert testimony about drug trafficking organizations. On the other hand, in Murillo, although that was one of the bases that this Court distinguished prior case Vallejo from Murillo was the issue of fingerprints, I argued to the Court that the – there was more than one basis to distinguish the Vallejo case, and that second basis was, and I'm quoting the opinion at 255 F. III, page 1177, the breadth of the expert testimony in those other cases, again, regarding, as Pineda-Torres and some of the other cases said, was a, quote, blueprint about the compartmentalized structure of international drug trafficking organizations, and then asking juries to extrapolate from that that this defendant who's here, who may or may not have any connection to such an organization, had knowledge, versus, on the other hand, the Murillo, Campos, and Cordoba line of cases where this Court has approved unknowing drug courier testimony. And I'd like to direct the Court, again, to the record specifically of the questions asked to the expert, because I drew those questions directly from Murillo at the government's excerpts of record at pages 238 through 239. I think it should be clear that there was no testimony about drug trafficking organizations. The questions asked were, would a drug trafficker entrust over half a million dollars' worth of narcotics, as we had in this case, to an unknowing drug courier? Can I ask you a question? Yes. Why do you need an expert to bring in modus operandi testimony on that? I mean, can't you just argue it? Yes, Your Honor. Why do you need that? And it's a point I actually debated about whether or not to put on this expert testimony. Well, I want to thank you for doing it, because it gives us more work and full employment. It keeps everybody busy. The reason I did it was the evidence is the gross national product. So it's patriotic. Go ahead. The evidence in the case was somewhat circumstantial. There wasn't direct evidence, but. Well, you've got all these phone calls going back and forth. That's correct, Your Honor. You've got the discussions about ecstasy. The guy that buys this gearbox from Belgium, huh? If he wanted one, he could have just bought it probably not too far away. Yes, Your Honor. So, I mean, you've got to give the jury some credit for having common sense. I agree, Your Honor. And I agree that if we were, if this Court were riding on a clean slate, it's clear from your dissent in Campos that you would find differently than the state of the lie is. And I don't take issue with that. All I was trying to do was establish, follow what is established precedent and stick strictly within the confines of Barrio. And when you're sitting there before trial. My dissent in Campos? Yes, Your Honor. Give me the citation to it. I haven't read it in a while. Can I have one moment, Your Honor? Get some comfort from it, maybe. Citation 217F3rd at 707. 217. F3rd. F3rd. 707. 707. Campos. Yes. And just by way, before this issue had been fully resolved in Campos, you questioned, Your Honor, in a case I would submit to the Court had much more compelling facts favoring the defendant, who in that case was a single mother of four children who had taken a short trip to Mexico and then drove back in a van belonging to a friend where there was marijuana hidden in the ceiling compartment. And in your lengthy dissent, you noted problems with whether or not under Federal Rule of Evidence 704B this type of testimony actually embraced the ultimate issue and supplanted the role of the jury. And the government obviously respects that dissent and that decision, but in determining whether or not to present this testimony in this case, given the state of the evidence, I decided to follow what I believe the law allowed and limited my questions exactly as they were done in Murillo. Getting back to the ---- Justice Oparande helps the jury understand complex criminal activities. What's so complex about this? Your Honor, respectfully, I don't think that Murillo was limited only to complex cases, because if you look at the facts of Murillo, what you had in that case was a drug courier in a rental car who left Santa Ana to drive to Washington. He was stopped along the way in the Eastern District of California, and this Court expressly approved this type of testimony. So I submit to your reading. I mean, I'm reading to you from an opinion by Judge Choi and Scopel and Wilkins. And let's see. I forget. I can't see the date on this. It's the Fed Second. 84. What's wrong with that one? Your Honor, over time, this Court has refined the rules and lines drawn regarding drug courier testimony, specifically from Cordoba in 1997 to Campos in 2000, and then most recently to Murillo in 2001. And following Murillo, Murillo, in fact, has been extended in Valencia, Amezcua, to apply not only to unknowing drug couriers, but people found at methamphetamine labs who claimed they were just on the premises unknowingly. But here's another one here. It's a 97 case, and Brunetti, Trott, and Thomas. And they talk here, testimony to drug traffickers do not entrust large quantities of drugs to unknowing transporters is not drug courier profile testimony. None of the expert testimony in this case was admitted to demonstrate that Cordoba was guilty because he fit the characteristics of a certain drug courier profile. In addition, the testimony was properly admitted to assist the jury in understanding modus operandi in a complex criminal case. So we're still talking about that, whatever it is, you know, 15 years later. Your Honor, as a – Because, you know, as soon as that modus operandi comes in, that's it, you know. One of the reasons – It's like bringing in, impeaching someone by prior felony convictions. As soon as the jury hears that, it's, well, you know, they've been here before, they'll do it again, you know. Again, I respectfully disagree and withdraw this distinction. I have two answers, Your Honor. First is, again, the cases were refined over time from Cordoba to Campos, where you issued your dissent along these lines, to finally Murillo in 2001, and then the extension of Murillo in Amezcua in 2002. And it's clear that this Court has now approved this type of testimony. And I realize that were you writing on a clean slate, you might find differently. But, again, we were trying to stick within the strict confines of what this Court had said right before the trial. And the reason I would say it wasn't a fait accompli once the testimony was proffered by the expert was – and this was one of the reasons I debated whether or not to put it on at trial – was one of the things the expert opined was that a drug trafficker wouldn't – who didn't – was an unknowing courier would not use the proper level of care with regard to the package if that person didn't know there was a half a million dollars' worth of narcotics in it. And in this case, the defendant – That's another possibility as well, Your Honor. But in this case, the expert would opine that a person wouldn't use the due degree of care. And the facts below showed that the defendant did not insist upon immediately picking up the package once he was alerted that it was at Mr. Tang's shop. And he said, oh, I could pick it up the following day, which I think was probably the best fact going for the defendant at trial and was strenuously argued by his trial counsel to the jury. I have a response as to what I think happened, which would be outside of the record, but I'll leave that aside for now. I'm sorry, Your Honor. Well, I was just wondering, what was the defect in his cooperation after he started talking? He sounded pretty garrulous to me. He told the agents about everything they wanted to know, except I guess he didn't know where Cheng was living at the time or where he could be found. But what was his defect that kept him from getting the discount for cooperation? Yes, Your Honor. The reason I sought to even engage in proffering this defendant was my office was also another prosecutor who was prosecuting the Wah Ching Gang, which is an organized crime outfit that operates in Los Angeles. And this defendant, Mr. Leung, was overheard on numerous occasions on the wiretap in that case discussing what strikes me specifically about not only drug dealing but how to resolve disputes between a, quote, underling of his and an underling of the leader or the lead defendant in that case, which charged racketeering and violent acts in aid of racketeering, including murder, named Tian-Wei Luong, L-U-O-N-G, not to be confused with Defendant Leung. The crucial defect, and then he proffered and he denied being a Wah Ching Gang member and denied that the intercepted call that we confronted him with, as well as the call about the resolving the dispute between him and his underling, he denied that he was a Wah Ching Gang leader and that he had anything to offer about that, despite having told the government that he was present at meetings where the Wah Ching Gang discussed how to deal with one of their rival entities, a gang called the Four Cs Gang, which actually is the nexus of the murder in that case because they did a drive-by shooting involving a member of that gang. So I found it not credible, his denial of membership. And then after he had proffered, when we came along to sentencing, he said, well, now I'm entitled to the safety valve. He didn't come in to do a safety valve proffer, not that the distinction makes a difference, but he said, I've come in and I've told the government all I have to know. And I argued to the district court, and I don't think she clearly erred when she found that his denial of being a member of the Wah Ching Gang in the face of these wire transcripts was not credible and not truthful, and on that basis, he had not carried his burden, which, as the circuit has said in Ajigwa, it is the defendant's burden to establish his eligibility for the safety valve. And that was the reason that the district court correctly denied him the two-level decrease for the safety valve. And then did she also cite to the 13 and the 33 phone calls with Chang as the basis to support her finding that he must have known a lot more about Mr. Chang than he was admitting to? Yes, Your Honor, she did. And she said, and I can quote to the Court, and this is in the government's excerpts of record at pages 82 through 83 where she made her findings to the district court. I feel certainly that the defendant had to have a close relationship with Fu Chang, yet the defendant didn't provide any information about Chang or his whereabouts. Of course, he said the drugs were due to him, but for 2,000 tablets that he was going to distribute along with this Ken Vae Luong Lee defendant in the Wah Ching case. And also leaving aside, obviously, that the defendant testified at trial and denied knowledge about the box, and then made the tactical decision to come in and proffer and admit, quite frankly, that he not only knew all about the contents, but how he was going to distribute it and who he was going to distribute it with, that being other Wah Ching gang members. If the Court has no further questions, I'm prepared to sum up. I ask that you affirm his conviction and sentence, and I thank you for your time. Yeah. I want to say this. I appreciate your candor and your manner, and I think you've got a good career ahead of you. Thank you, Your Honor. I appreciate that very much. Sorry we lost you to Chicago. Thank you. I appreciate that very much. Nice to see you. We all come back. And the winner is the winner. Your Honor, just a few comments about Murillo. I don't agree with counsel's interpretation of Murillo. I don't think that it expanded the law or that it added anything new. The evidence was admissible because the defendant put the government on notice that it was going to have to rebut certain parts of the defense, and the Court in the court. Mr. Bronson, I don't want to sound unduly defensive since I wrote Murillo, but how do you distinguish our language in the opinion, and I'm looking at 255 F. 3rd at 1177, where we talk about the sole issue at trial was whether the defendant knew that the car he was driving contained drugs, and that the expert testimony, which is identical to the testimony that was admitted at Mr. Lung's trial, went right to the heart of the defense that he was simply an unknowing courier. Your Honor, I'm just. I mean, did I not mean what I said when I wrote that? But reading McGowan, which interpreted, which came out after Murillo, they said that Murillo was distinguishable because the government, and I discussed this at page 29 of the opening brief, because in Murillo, the defendant had designated a fingerprint expert, and that's how they distinguished it, distinguished the case. The fingerprint expert was to establish the fact that his prints hadn't been found on the package, therefore, he couldn't have known what was inside it, even though he had two screws to the rear door panel in his shirt pocket when he was arrested. It still, it all goes to the same defense. You know, I didn't know that there were drugs in the car. Your defense was, I didn't know there were drugs in the package. I thought I was ordering a gearbox. I just don't. I hear your argument. I'm just, I'm wrestling with how that distinguishes Mr. Lung's case from Mr. Murillo's case. Kennedy. Well, in distinguishing Murillo, the Court in McGowan found that that was a critically important point, in addition to the fact that the, Murillo did not involve a 403 objection. That's how they were to distinguish it, and that's how I'm distinguishing it, relying on McGowan when they distinguish that case. And it comes back to the essential principle that in a modus operandi evidence is not admissible in a noncomplex case. And the cases that have developed the doctrine from that general principle, and I don't think the government met the requirements that this whole line of cases talk about. In terms of the, of cooperation, first of all, the trial counsel pointed out that he was not asked about a lot of misinformation about Chen. And secondly, I relied on the, in the opening brief, I relied on Sanchez at page 7677, in which they found that Sanchez appeared to be a novice and wouldn't know a lot about this individual. And here, the defendant also was not, as far as his record goes, he does not appear to be a particularly sophisticated individual. And I would submit on that, unless there's further questions. Thank you very much. And the matter will stand submitted and the court will recess until 9 a.m. tomorrow morning.
judges: Goodwin, Pregerson, Tallman